```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
THOMAS T. PROUSALIS, JR.,               :
                       Petitioner,      :    06 Civ. 12946 (DLC)
                                        :         03 CR. 1509
          -v-                           :
                                        :    OPINION & ORDER
UNITED STATES OF AMERICA,               :
                       Respondent.      :
                                        :
----------------------------------------X
```

Appearances

For Petitioner:
Thomas T. Prousalis, Jr., Pro se

For Respondent:
Michael J. Garcia
United States Attorney
Seetha Ramachandran
Assistant United States Attorney
United States Attorney's Office for the
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

DENISE COTE, District Judge:

In the midst of his criminal trial on fraud charges in 2004, Thomas T. Prousalis, Jr. ("Prousalis") entered a plea of guilty. On November 6, 2006, Prousalis filed a petition for a writ of habeas corpus pursuant to Title 28, United States Code, Section 2255, contending inter alia that the two attorneys whom he retained and who represented him at trial, at sentencing and on appeal, provided ineffective assistance. For the following reasons, the petition is denied.

### Background

Because the petition raises so many points that flatly
contradict the record in this case, the description of the
proceedings that led to the plea and sentence are described in
some detail.  Prousalis, who is an attorney, was arrested on
January 7, 2004, on a two count indictment charging him and co-
conspirator Robert Kirk, Jr. ("Kirk") with conspiracy to commit
securities, mail and wire fraud, and with wire fraud, in
violation of 18 U.S.C. § 371 and 15 U.S.C. §§ 78j(b) and 78ff,
respectively.  The indictment charged that Prousalis, who held
himself out as a securities law expert for small companies that
needed capital, served as outside counsel to busybox.com Inc.
("Busybox").  Working with Kirk, a principal in the investment
banking firm Barron Chase Securities Inc. ("Barron Chase"),
Prousalis made materially false statements orally and in writing
in connection with an initial public offering ("IPO") for
Busybox in the year 2000.  Kirk had pleaded guilty on December
30, 2003, to an information.

As charged in the indictment, the false statements in
connection with the IPO included the nature of the underwriting
agreement between Barron Chase and Busybox, the use of proceeds
from the IPO, and the fees paid to Prousalis in connection with
the IPO.  While the registration materials for the IPO described
the IPO as a firm commitment underwriting, Barron Chase was

2

either unable or unwilling to underwrite the IPO on that basis. With a shortfall of over $2 million, Prousalis and others agreed to use IPO proceeds to pay Prousalis's fee and to purchase IPO shares on behalf of Busybox officers and directors, which would then be paid to them as salaries or future bonuses. This use of IPO proceeds was not disclosed in the registration materials for the IPO. Prousalis falsely represented to Busybox that an SEC examiner had confirmed to him that this arrangement was proper. Prousalis also knew that if his fee had been properly disclosed in the registration materials that Busybox would not have qualified for listing on the NSADAQ exchange since the disclosure would have revealed that the company did not have sufficient net tangible assets.

As a result of the scheme, over 2.5 million shares were sold at $5 per share. Prousalis earned approximately $1.2 million. The IPO occurred in May 2000, but by April 2001, Busybox was delisted by the NASDAQ and by July 2001, Busybox had filed for bankruptcy. While the officers of Busybox who received IPO shares did not sell them, Prousalis sold his shares in September 2000 for approximately $750,000.

A federal defender represented Prousalis at his arraignment on January 13. A trial date of June 7 was set. Thereafter Prousalis retained David Kenner ("Kenner") and Alvin Entin ("Entin") to represent him. Kenner appeared on behalf of

3

Prousalis at a conference on February 24, and described his
extensive experience representing defendants in criminal cases.
After leaving a district attorney's office in 1972, he tried
criminal cases in both federal and state court.  The two
attorneys continued to represent Prousalis through his trial and
at his plea, which he entered mid-trial.  Entin was present at
the sentence and Kenner represented Prousalis on appeal.

On April 2, defense counsel filed a series of motions.
They purported to give notice that Prousalis would be asserting
a public authority defense, and moved to strike the overt acts
from the indictment and to dismiss the indictment.  On April 30,
the Government gave notice of an intent to offer similar act
evidence at trial.

Meanwhile, on April 23, the Government had notified defense
counsel that it would be seeking a superseding indictment, and
described the one count it expected to add to the charging
instrument.  On May 10, the superseding indictment was filed.
It added a third count for failure to disclose the "interest of
counsel" in the IPO, in violation of 15 U.S.C. § 77x and 17
C.F.R. § 228.509.  This charge incorporated the detailed factual
allegations from the first two counts of the indictment and
stated, inter alia, that Prousalis failed to disclose in the
Busybox registration materials that Prousalis's legal fee was

4

contingent on the IPO closing and that he received the fees in Busybox securities.

On May 12, Entin joined Kenner at the arraignment on the superseding indictment and sought permission to be admitted pro hac vice.  Entin explained that he was admitted to practice before nine circuit courts and in Florida district courts.  He had been practicing criminal law since 1979, and had previously been admitted pro hac vice in three or four criminal cases in this district.  His application was granted.

As for the arraignment on the superceding indictment, the Court explained on May 12 that the arraignment was on a "superseding indictment" and that the Court wanted to make sure that Prousalis had a copy of the "superseding indictment" in front of him.  The Court asked, "Am I correct it's S1?" and the Government confirmed that that was its number.  When the Court inquired, "Mr. Prousalis, have you been given a copy of the indictment S1 03 Cr 1509?," Prousalis answered, yes.  His counsel waived a reading of the indictment and Prousalis pleaded not guilty.

Kenner pointed out that the superseding indictment had a new count, labeled as count three, and indicated that he wanted to move to dismiss the count.  The Government described giving prior notice to defense counsel that the count would be added and explained that the charge was "substantially related" to the

prior charges and concerned the same conduct on which the original charges were based. A schedule was set for a motion to dismiss count three, but defense counsel never filed the motion.

Just two days later, on May 14, the Government described Kenner's criminal record in a letter to the Court. At a May 17 Curcio proceeding, Prousalis indicated that he wanted Kenner to continue to represent him despite Kenner being on probation following his federal conviction for a misdemeanor tax crime. Prousalis acknowledged that he had learned of these facts before retaining Kenner and had quizzed Kenner about them for approximately an hour before retaining him. Prousalis characterized the conflict issue as a "tempest is a tea pot." He said that he had

> never seen a more hard-working, dedicated lawyer in my life. I've been a member of the bar for 25 years. Quite frankly, he gets me up in the morning. I'm on the east coast and he's on the west coast and we have a great rapport . . . .I've talked to three or four independent people, both on the west coast and on the east coast, and they tell me that they have witnessed him in the courtroom and they are most impressed with his abilities . . . . I'm very happy to have Mr. Kenner as my counsel. I'm looking forward to the trial . . . .

Prousalis refused the offer to meet with CJA counsel to discuss the matter further or to take a few days to reflect on the issue. Prousalis reported that he had already discussed the issue with "independent counsel" for whom he had a high regard, and that they both had come to the conclusion that no conflict

6

existed and that Prousalis was "fairly and competently represented."

On June 2, the Court denied the defendant's motion to dismiss the first two counts of the indictment. The defendant had argued that the trial evidence would show that there were no material omissions or false statements in the registration statement for the IPO. The Opinion noted that the defendant had not even argued that the indictment omitted the elements of the crimes with which he is charged or that it failed in any other way to give him adequate notice. United States v. Prousalis, No. 03 Cr. 1509 (DLC), 2004 WL 1198495 (S.D.N.Y. June 2, 2004).

Also on June 2, the Court denied the Government's motion to offer similar act evidence on its case in chief, without prejudice to a renewal of the application at the end of the defendant's case in the event that the defendant presented evidence regarding his intent. The similar act evidence related to six IPOs in which Prousalis had served as issuer's counsel and allegedly had made false statements and material omissions in the IPO registration statements. In most of those cases, Prousalis had brought the company to the underwriter. United States v. Prousalis, No. 03 Cr. 1509 (DLC), 2004 WL 1203150 (S.D.N.Y. June 2, 2004).

Trial began on June 7, twenty-eight days after the superseding indictment was filed. Kenner gave a detailed

7

opening statement to the jury on June 8, which laid out the
defenses to each of the charges.  He predicted inter alia that
the evidence would show that Busybox went bankrupt because of
gross mismanagement by its officers and directors, and not
because of the manner in which the IPO process was conducted.
He attributed the difference between the registration
statement's report of Prousalis's legal fee as $375,000 and the
$1.25 million he actually received in legal fees both to a
payment to Prousalis for arranging for Busybox's listing on the
NASDAQ exchange and to a retainer he received for representing
Busybox during the year following the IPO.  Insofar as the
accusation that Prousalis had fabricated a memorandum of a
conversation with an SEC attorney, Kenner predicted that the SEC
attorney would not be able to recall precisely what he said to
Prousalis.

        Eight witnesses testified at trial before Prousalis pleaded
guilty.  Karen Garnett, an assistant director for disclosure
operations in the corporate finance division of the SEC,
testified as an expert.  Jon Bloodworth, a principal in a
private equity firm, was one of the founders of Busybox and
formerly its CEO.  Peter Seligmann, the founder of Conservation
International, was formerly an outside director and shareholder
of Busybox and a personal friend of Prousalis.  Neil Alexander
was a senior case manager at the Enforcement Department of the

8

NASD. Roger Scott Roberg was the chief financial officer at Fiserv Securities, which performed back-office operations for Barron Chase during the IPO. Bernard Carl was also a close personal friend of Prousalis and an investor in Busybox. At the time of his testimony he was a principal in Brazos Europe. David Link was a staff attorney with the division of corporate finance at the SEC and the legal examiner who had reviewed the Busybox IPO submissions to the SEC and the person whom Prousalis had identified as excusing him and Busybox from making any further disclosures in the registration statement about the recirculation of the IPO proceeds. Walter Jackowiec, an attorney in Chicago, was an investor in Busybox.

The Government was expected to play on June 15 portions of the Prousalis deposition testimony given during civil litigation arising out of the collapse of Busybox, but on that day Prousalis pleaded guilty to all three counts in the indictment pursuant to a plea agreement. In the plea agreement, he stipulated that the offense level was 23, the criminal history category was category I, and the sentencing guidelines range was 46 to 57 months' imprisonment. He agreed that he would not seek a departure, and that he would "not file a direct appeal, nor litigate under Title 28, United States Code, Section 2255 and/or Section 2241, any sentence within or below the stipulated Sentencing range set forth above."

In his plea allocution, Prousalis indicated under oath that he was satisfied with his attorneys' representation of him. He represented that he had had a sufficient opportunity to discuss his case with his attorneys, as well as a sufficient opportunity to discuss with them the charges to which he was pleading guilty, any defenses that he had to those charges, and the consequences to him of pleading guilty. In acknowledging each of the rights associated with a trial that he was waiving, Prousalis indicated that he understood that the trial would not continue and that he would be sentenced on the basis of his plea of guilty. Each of the three charges was explained to him in detail, as well as the penalties associated with each charge.

Prousalis was also questioned in detail about the plea agreement. He identified the document, explained that he had read it and discussed it with his attorneys before signing it, that no one had forced him to sign it, and that he understood the agreement. He acknowledged understanding that "by signing this agreement you have given up your right to appeal your sentence or of challenging or litigating your sentence so long as [the Court does] not impose a sentence of greater than 57 months in prison." He also acknowledged that he had waived his right to argue for a sentence of less than 46 months in prison.

In his allocution Prousalis admitted knowing by mid-June 2000 that Barron Chase was "backing out of a firm commitment

IPO." According to Prousalis, Barron Chase told him that the
only way to close the IPO was to use Prousalis's legal fees and
the officers' salaries and bonuses to make up a $2.5 million
shortfall in the IPO. Prousalis created a bill in the amount of
$1.25 million, which combined with salaries and bonuses for the
officers, made up the IPO shortfall. He explained that he did
not file an amendment to the registration statement reflecting
the manner in which the additional $2.5 million was created to
complete the IPO. Prousalis continued, "I did not disclose the
true terms with my retainer agreement in the registration
statement filed with the SEC and I listed my fee as $375,000 and
omitted the full 7.5% fee and omitted from the prospectus that I
would have been paid nothing had the IPO not . . . successfully
closed." Prousalis admitted that the failures to disclose the
7.5% fee and its contingent nature in the registration statement
were both material to investors. Prousalis answered yes, when
asked whether he understood that the failure to disclose the
recirculation of IPO proceeds was also a material omission.
Prousalis admitted that he had omitted disclosure of the 7.5%
term of his retainer agreement because he understood that
Busybox would not be listed on the NASDAQ if that fact were
disclosed. For this same reason, he hid the fact that $2.5
million of the IPO proceeds had been used to pay officers and
him. Prousalis specifically admitted that at the time he did

11

each of these acts he knew he was doing something wrong, knew he was acting in violation of the law, and was acting with the intent to deceive and defraud investors in Busybox securities.

The Probation Department issued a draft presentence report on August 24, 2004. The final report was dated September 17, 2004 ("Report"). The Report found an offense level of 25, which was two levels higher than the plea agreement, because it applied an adjustment for use of sophisticated means in the commission of the offense. It noted objections that the defendant had made to the draft report. On September 28, the Court received Kenner's written objections to the presentence report, requesting a sentence within the range of 0 to six months. Attached to the submission were over a dozen letters written by family and friends of Prousalis requesting leniency.

On October 28, Prousalis was sentenced principally to 57 months' imprisonment. At the sentencing, the Court raised the possibility that Prousalis would not be given an adjustment for acceptance of responsibility because of statements he made minimizing his guilt in a September 11 letter to the Court seeking leniency. Cf. United States v. Ubiera, 486 F.3d 71, 76-77 (2d Cir. 2007). In explaining why it was considering withholding the adjustment, the Court described at length the trial evidence concerning Prousalis's fraudulent conduct that had led the Court to conclude that the scheme was "a calculated

12

venture on the defendant's part to enrich himself . . . at the
expense of a very small company and its investors."  The Court
specifically rejected the defendant's contention in his
September 11 sentencing letter that his good judgment had been
overwhelmed by circumstances and that his error was one of
succumbing to pressure from Busybox:  "As far as I can tell,
this whole . . . fraud was his plan and driven by him and not
driven by the company."

   As the Court summarized the trial evidence, Busybox:

   was a small company that had very modest positive
   cash flow and that wasn't looking for much in terms
   of an initial investment from somebody.  It wasn't
   asking to go public.  It wasn't seeking to do an
   IPO.  What they wanted to do was raise just several
   hundred thousand dollars, and what happened is . . .
   they got introduced to the defendant and [his
   associate] Mr. Grotto, and before you know it, what
   was being talked about was an IPO with a minimum of
   $10 million.

      And then, at the defendant's urging, . . . a
   CEO and a CFO were put in place in the company at
   exorbitant salaries . . . and those salaries alone
   changed the situation from one with a positive cash
   flow into a company that couldn't carry the salary
   burden that was imposed upon it.

      These two people who were friends of Mr.
   Prousalis and colleagues of his, the CEO and CFO,
   were installed in offices on the East Coast when the
   company was operating on the West Coast and, as far
   as I could tell, had no role in the company except
   to provide a level of control over this IPO process.

      . . . .

      [T]he company wanted to get a small cash
   infusion, and the defendant dangled in front of the

company large sums of money through an IPO and got
their agreement to something that they themselves
had not been seeking to do.

Then there was a year-long process here, not
[the defendant] succumbing to pressure at the end .
. . .  [I]n his very first draft of the registration
statement, [the defendant] misdescribed his retainer
agreement, and Mr. Bloodworth [the CEO] corrected it
to  describe  it  accurately  in  the  registration
statement.   The defendant took out the insertion,
and they did that several times.

Finally, they had a conversation about it, in
which the defendant assured Mr. Bloodworth  that the
change  he  was  making  in  the  omissions  from  the
registration statement [was] fine and he would speak
to the SEC about the issue and confirmed it was okay
to  leave  out  a  correct  description  of  the
compensation and the fact that it was a contingent
fee structure.

Then when it comes towards the end, a year
later, towards the end of the proceeding . . . the
defendant knew long before the insiders in the
company that this wasn't going to be effectively a
firm commitment underwriting and that they were
going to need cash that they hadn't been able to
raise and that the solution was this recycling of
proceeds in a misleading way, to paint a very
different picture of how the IPO was operating.

His endeavor in this regard lasted weeks if not
a month, and it was only sort of when the IPO
happened, at least the company thought [the IPO had
happened], and they were thrilled, and then the news
is dumped on them like a ton of bricks that no, it
didn't really happen, there wasn't a firm commitment
underwriting, that Barron Chase wouldn't be taking
the risk here of selling all the shares and we had
to engage in this maneuver.

So  it  wasn't  a  matter  of  Mr.  Prousalis
succumbing to pressure from outside, but it was a
matter  of  him  designing  something  from  the
beginning, something that he knew if he were honest
with the SEC, it would never have passed muster;

14

something he knew if he was honest with the NASDAQ
about, it would never have passed muster; and
something that investors, if it were accurately
described, it would have been material to them, and
they wouldn't have lost their money as they did, or
at least they clearly wouldn't have been at risk
because they wouldn't have invested.

No one from the company forced [the defendant]
to design these maneuvers.  No one from the company
forced him or asked him or encouraged him to write a
misleading registration statement.  No one from the
company suggested or asked him or encouraged him to
lie about conversations he was having with the SEC.

The Court also took issue with Prousalis's suggestion that
the IPO could have been successful if restructured.  The Court
noted that the trial witness from the NASDAQ testified that
Busybox would never have qualified for listing on that exchange
if its financial condition had been accurately described.
Moreover, the IPO could not have worked without the securities
being listed on the NASDAQ.

Finally, the Court pointed out that Prousalis also
perpetrated a fraud following the collapse of the IPO.  He
created a fictitious invoice and backdated it, among other
things, which strongly indicated his consciousness of guilt.

Prousalis's attorney argued that Prousalis had accepted
responsibility for his crimes.  He explained that Prousalis's
finances were in dreadful shape and that Prousalis did things
that he should not have done because of that financial pressure.
The attorney emphasized that Prousalis had never denied that he

misrepresented his legal fee in the registration documents. He also admitted that Prousalis should not have fabricated a bill after the fact to cover up the fraud. Entin explained that in his September 11 letter that Prousalis was just trying to maintain some "dignity."

After a break so that Entin and Prousalis could speak with each other,[1] Prousalis explained that he wrote the September 11 letter to convey that he had made some very serous mistakes, had exercised very bad judgment, and was sorry. He said, "I did not take the stand in the trial that I stopped, and I thought that the letter was a good way to convey to you what my feelings were." He described the two large issues in the indictment as his misrepresentation of his legal fee and the other false statements in the registration statement. He admitted that from the beginning the legal fees were not described accurately in the registration statement, including in each of the seven amendments to the registration statement. It should have disclosed the 7.5% fee and only disclosed the $375,000. He acknowledged that he omitted the accurate description of the fee because Busybox would not have qualified for listing on the NASDAQ if the fee had been accurately reported. He admitted

---

[1] The Court offered to adjourn the sentence for another week so that counsel and the defendant could have more time to discuss the issues that were being raised. Entin conferred with Prousalis and represented that Prousalis did not want the week's adjournment.

16

that the contingency nature of the fee had to be disclosed as well and was not.  As for the use of IPO proceeds to pay him and officers of Busybox, Prousalis described that as the IPO scheme and characterized it as wrong, misleading, and fraudulent.   He also admitted fabricating a memo to describe a conversation with the SEC examiner who testified at the trial.   Prousalis used that memo to assure Busybody officers that no further public disclosures had to be made about the recycled IPO proceeds.[2]   In answer to a series of questions from his attorney, Prousalis reaffirmed that he knew that what he was doing was wrong and in violation of the law.

Despite reservations that Prousalis was still not sufficiently forthright and honest about the essential role that he had played in the criminal scheme, the Court adjusted the sentencing guidelines range by two levels for acceptance of responsibility.   The Court reasoned,

> I think this is somewhat of a close question, in all
> honesty, because I think that Mr. Prousalis is still
> not articulating in a forthright and honest manner
> his intent to defraud, and his essential role in the
> scheme.   But that said, I think he has dealt with,
> sufficiently, the issues I raised in connection with
> the September 11 letter, that it is appropriate to
> give the acceptance of responsibility credit.

---

[2] In his petition, Prousalis asserts that the SEC attorney had in fact assured him that the participation of "friends and family" in the IPO did not need to be disclosed provided that no one person purchased 10% or more of the IPO.

Defense counsel made an objection to the sophisticated means adjustment based on Blakely v. Washington, 542 U.S. 296 (2004), and as impermissible double counting. The objections were denied. The sentence that was imposed was at the top of the range to which the defendant had stipulated in his plea agreement.

Prousalis appealed. The Government moved to dismiss the appeal or in the alternative for a summary affirmance based on the waiver of appeal contained in the plea agreement. On December 29, 2005, the Court of Appeals dismissed the appeal "because the appellant knowingly and voluntarily waived his right to appeal and the sentence was not based on a constitutionally impermissible factor such as bias," citing United States v. Haynes, 412 F.3d 37, 39 (2d Cir. 2005)(per curiam); United States v. Morgan, 406 F.3d 135, 137-38 (2d Cir. 2005); United States v. Roque, 421 F.3d 118, 124 (2d Cir. 2005). United States v. Prousalis, No. 05 CR 0671 (2d Cir. Dec. 29, 2005) (granting motion to dismiss appeal).

## Discussion

Prousalis contends that both of his retained attorneys provided ineffective assistance. He complains about their preparation for and performance at trial; their failure to give him a copy of the superseding indictment or to request a

18

continuance of the trial; the failure to move to dismiss the third count added by the superseding indictment; their failure to respond to certain correspondence from the Government; their failure to confer with him regarding the plea agreement; their representation of him at sentencing; and their failure to request an en banc rehearing before the Court of Appeals or to file a petition for a writ of certiorari to the Supreme Court. Prousalis also claims that his rights under the Speedy Trial Act were violated; that the Government violated his Fifth Amendment rights by obtaining evidence against him from third parties; and that his Sixth Amendment right to counsel of his own choosing were violated because his bail bond company chose his attorneys.

Prousalis does not seek to be resentenced. He asks that his conviction be vacated and that the charges against him be dismissed. Implicitly, he asks in the alternative for a second trial.

A.  Ineffective Assistance of Counsel Claim

"[I]n order to prevail on an ineffective assistance of counsel claim, a defendant must show (1) that his attorney's performance fell below an objective standard of reasonableness, and (2) that as a result he suffered prejudice." United States v. Jones, 482 F.3d 60, 76 (2d Cir. 2006), cert. denied, 127 S.Ct. 1306 (Feb. 20, 2007) (citing Strickland v. Washington, 466

U.S. 668, 687 (1984)). The performance inquiry examines the reasonableness of counsel's actions under "all the circumstances," Greiner v. Wells, 417 F.3d 305, 319 (2d Cir. 2005) (citing Strickland, 466 U.S. at 688), and from the perspective of counsel at the time, id. (citing Rompilla v. Beard, 545 U.S. 374, 389 (2005); Strickland, 466 U.S. at 689). Counsel is "strongly presumed" to have exercised reasonable judgment in all significant decisions. Id. (citing Strickland, 466 U.S. at 690). Prejudice forms the second half of an ineffective assistance claim. The defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Lynn v. Bliden, 443 F.3d 238, 247 (2d Cir. 2006) (citing Strickland, 466 U.S. at 688, 694). The habeas petitioner bears the burden of establishing both deficient performance and prejudice. See Greiner, 417 F.3d at 319.

1. Preparation for and Performance at Trial

Most of the ineffective assistance claim rests on Prousalis's accusations against Kenner and Entin in connection with the trial. These accusations are flatly contradicted by Prousalis's enthusiastic and unequivocal endorsement of Kenner during the Curcio inquiry on May 17, roughly three weeks before trial, and Prousalis's sworn statement when he entered his plea

20

that he was satisfied with the representation that counsel had

given him.  Moreover, Prousalis spoke at length at his

sentencing proceeding and made no complaint about his counsel

then.

There is in fact no need to consider this portion of the

claim further since Prousalis stands convicted through entry of

a plea.  "A defendant who pleads guilty unconditionally while

represented by counsel may not assert independent claims

relating to events occurring prior to the entry of the guilty

plea."  United States v. Coffin, 76 F.3d 494, 497 (2d Cir.

1996).  This bar applies as well to "ineffective assistance

claims relating to events prior to the guilty plea."  Id. at

498.  As the Court explained in Tollett v. Henderson,

> a guilty plea represents a break in the chain of
> events which has preceded it in the criminal
> process.  When a criminal defendant has solemnly
> admitted in open court that he is in fact guilty of
> the offense with which he is charged, he may not
> thereafter raise independent claims relating to the
> deprivation of constitutional rights that occurred
> prior to the entry of the guilty plea.

411 U.S. 258, 267 (1973).  Such "antecedent" claims are no

longer "relevant" to the question at hand, United States v.

Gregg, 463 F.3d 160, 163-64 (2d Cir. 2006) (discussing Tollett),

which is simply "whether the guilty plea was made intelligently

and voluntary with the advice of competent counsel."  Tollett,

411 U.S. at 265.  To show ineffective assistance of counsel in

21

these circumstances, a petitioner must demonstrate that his attorney's "advice" to plead guilty "was not within the range of competence demanded of attorneys in criminal cases.  Id. at 266 (citation omitted).

Prousalis does not contend that defense counsel failed to give him adequate advice in connection with his decision to plead guilty.  Indeed, he describes that decision as a decision he made.  Even if a review of the specifics of Prousalis's complaints about the quality of his attorneys' performance prior to the trial were necessary, however, such a review reveals that he has failed to satisfy the Strickland standard.

Prousalis first contends that his attorneys failed to "meet or confer" with him "in any meaningful manner."  He complains that they did not open the twenty boxes of discovery materials provided by the Government, discuss these documents with him, conduct a mock trial, perform a "jury analysis," or spend enough time talking with him prior to the trial.  He estimates that before trial Kenner conferred with him for about 35 hours and Entin for less than three hours.

Despite these complaints, Prousalis has not identified any document from those twenty boxes that would have assisted him in presenting a defense and with which his counsel were unfamiliar. Similarly, Prousalis does not identify any fact or argument that he did not have an opportunity to convey to his counsel, much

22

less one that would have made a difference to his defense.  But, most significantly, Prousalis does not point to any omission from Kenner's opening statement at the trial or his cross-examination of the Government's witnesses that suggests that defense counsel was ill-prepared to defend him at trial.  To the contrary, the opening statement showed a detailed knowledge of the issues in the case and a strategy for defending against the charges.  The evidentiary arguments to the Court and the cross-examination of the Government witnesses also reflected a thorough-going familiarity with the evidence and potential defenses.  Finally, it is a rare defendant that is able to fund the conduct of a mock trial or hire a jury consultant.  It does not constitute ineffective assistance of counsel to proceed to trial without having undertaken such efforts.

Prousalis next contends that his attorneys should not have waived his rights under the Speedy Trial Act and allowed the trial to proceed on June 7, less than thirty days after his arraignment on the superseding indictment.  The Speedy Trial Act does not mandate the delay of a trial for thirty days following arraignment on a superceding indictment.  United States v. Rojas-Contreras, 474 U.S. 231, 236 (1985).  Moreover, Prousalis contends incorrectly that the third count, which was added to the original indictment, "materially changed" the facts previously alleged in the indictment.  Prousalis has not shown

23

that he suffered any prejudice from the trial proceeding on
schedule.

Prousalis also contends that his attorneys should have
moved to dismiss the superceding indictment since he had
substantial defenses to count three. He asserts that
"[d]eception played no part in the defendant's representation of
busybox," that his legal fees and expenses "were properly
disclosed" in the registration statement, and that without a
proper motion to dismiss the superseding indictment he "never
had a chance." For the reasons given in the Opinion denying the
defendant's motion to dismiss the other two counts in the
indictment, these arguments fail to address the legal standard
for challenging an indictment and would not have succeeded in
obtaining dismissal of the third count of the indictment.

Prousalis asserts that his attorneys failed to interview
witnesses to prepare for trial, and lists the Busybox auditor,
its corporate counsel, its officers and directors, and Barron
Chase personnel, among others. Prousalis, however, has provided
no affidavit from any of these individuals to support a claim
that any one of them had competent, exculpatory evidence to
provide in his defense. With one exception, he does not even
describe what these witnesses could have said in his defense.
Prousalis does assert that Ms. Jane Flood had told him that Kirk
had told her that he was innocent and wanted to change his

guilty plea.  Without an affidavit from Kirk or some description
of Kirk's anticipated trial testimony, this potential
impeachment of Kirk has no relevance.

Prousalis further asserts that his attorneys should have
but did not respond in writing to fifteen letters sent by the
Government, many of which were sent before the trial.  These
letters addressed such matters as the filing of the superseding
indictment, Kenner's criminal record, Rule 404(b) evidence, and
expert testimony.  Defense counsel did in fact make written
submissions on some of these issues, and succeeded, for example,
in preventing the Government from offering the Rule 404(b)
evidence in its case in chief.  In each instance, defense
counsel was heard on the issue at a conference with the Court.
In any event, Prousalis also has failed to identify any
prejudice from the failure to respond in writing to some of the
Government letters.

Finally, Prousalis objects to two items in his counsel's
performance during the trial.  He contends that they should have
objected as the prosecutor "nervously" referred to him as a
"crook" in its opening statement, and to the photographs of his
home and aircraft that the Government offered into evidence.  As
to the latter issue, defense counsel did object.  As to the
former issue, this single failure to object during an opening
statement does not constitute ineffective assistance.

2.  Plea

To be valid, a guilty plea must represent a "voluntary and intelligent choice among the alternative courses of action open to the defendant." Wilson v. McGinnis, 413 F.3d 196, 198-99 (2d Cir. 2005) (quoting North Carolina v. Alford, 400 U.S. 25, 31 (1970)); see also Hill v. Lockhart, 474 U.S. 52, 56 (1985). "Ineffective assistance of counsel may render a guilty plea involuntary, and hence invalid." United States v. Couto, 311 F.3d 179, 187 (2d Cir. 2002) (citation omitted).

A defendant's claim that his guilty plea is involuntary or unknowing as a result of ineffective assistance of counsel is evaluated according to the same Strickland standard discussed above. Hill, 474 U.S. at 57 (applying the Strickland standard to guilty pleas); see also Couto, 311 F.3d at 187. First, a defendant must establish that his "counsel's representation fell below an objective standard of reasonableness." Hill, 474 U.S. at 57 (citation omitted); United States v. Hernandez, 242 F.3d 110, 112 (2d Cir. 2001) (per curiam). As noted above, a defendant who enters a plea on the advice of counsel must therefore demonstrate that counsel's advice was outside "the range of competence demanded of attorneys in criminal cases." Hill, 474 U.S. at 56 (citation omitted). In the context of a guilty plea, defendant must show that counsel's "deficient

performance undermines the voluntary and intelligent nature of the defendant's decision to plead guilty." United States v. Arteca, 411 F.3d 315, 320 (2d Cir. 2005). Second, the defendant must show prejudice, that is, "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Id. at 59; see also Hernandez, 242 F.3d at 112.

In connection with the entry of his plea, Prousalis complains principally of the advice his attorneys gave him when he executed the plea agreement. Prousalis contends that his attorneys did not "properly" review or discuss the plea agreement with him, that they failed to negotiate the terms with the Government and advised him to sign the document "as is." He asserts that he did not understand the agreement's "words of art." In particular, he attacks the agreement's sentencing guidelines calculation to the extent it was based on a loss exceeding $10 million. He points out that the agreement does not state that he caused the loss, argues that he did not cause the loss, and blames the loss on the management of Busybox. He asserts that because of the failures of his counsel, he did not knowingly, voluntarily and competently sign the agreement or waive his right to appeal his conviction or his sentence. Prousalis explains that he simply "kowtowed and pandered in his answers to the court's inquiry and concerns."

27

Prousalis's accusations against his attorneys in connection with the plea agreement are flatly contradicted by his plea allocution, in which he swore that he had read and understood the document, and was satisfied with the representation provided to him by his attorneys.  The Court is entitled to rely on these statements, and they will not be set aside based on vague or conclusory allegations.  "[T]he representations of the defendant [at a plea hearing] . . . constitute a formidable barrier in any subsequent collateral proceedings. . . . The subsequent presentation of conclusory allegations unsupported by specifics [in a habeas petition] is subject to summary dismissal."  Blackledge v. Allison, 431 U.S. 63, 73-74 (1977).  See also United States v. Hirsch, 239 F.3d 221, 225 (2d Cir. 2001); United States v. Torres, 129 F.3d 710, 715 (2d Cir. 1997).

In any event, Prousalis's attack on the quality of representation that he received in connection with the decision to execute the plea agreement with the Government has no impact on this petition.  While the plea agreement barred any attack on the sentence imposed on Prousalis to the extent that it fell within the stipulated sentencing range, it will not be read to bar a collateral attack on the plea to the extent that Prousalis is able to show that it was not knowing and voluntary.  Whether Prousalis was well represented in connection with his decision to enter the agreement is an entirely separate issue from the

representation he received in connection with his decision to plead guilty. Moreover, since Prousalis has repeatedly asserted in this petition that he is not attacking any aspect of his sentence, the issues he has raised that relate to the plea agreement have little or no relevance here.

In his reply memorandum, Prousalis asserts for the first time that he would not have pleaded guilty but for counsels' ineffective assistance during the pre-trial, trial, and plea stages, and that his plea was therefore invalid under Strickland and Hill. Prousalis's self-serving and conclusory assertion in his reply that he would not have pleaded guilty but for these errors, viewed in the context of the record as a whole, is insufficient to show that these claimed failings "altered [his] decision" to continue with his trial instead of pleading guilty. Aeid v. Bennett, 296 F.3d 58, 64 (2d Cir. 2002); see also Arteca, 411 F.3d at 322.

Prousalis was fully advised at the plea of the charges in the indictment, and had of course heard those charges described in the parties' opening statements at the trial and heard the testimony of eight witnesses addressed to those charges. He was informed during the allocution of the sentence that he faced. And he does not and could not assert that he had any doubt about his right to continue with the trial. Moreover, in his allocution Prousalis testified under oath that he had had a

29

sufficient opportunity to discuss with his counsel the charges against him, his defenses to those charges, and the consequences to him of entering a plea. At his sentencing proceeding, he acknowledged that the decision to stop the trial and to enter a plea was a decision that he made. That acknowledgement is supported by his plea allocution, and by his obvious and undisputed competence to make that judgment. As an experienced attorney, Prousalis was ideally situated to make an independent evaluation of the decision to continue with the trial or to enter a plea. Finally, Prousalis entered his plea pursuant to a written agreement that the Government would not oppose a two-level adjustment for acceptance of responsibility. If Prousalis had been convicted at trial the Government would no doubt have opposed such an adjustment and would also have been free to argue for an enhanced sentence based on the similar act evidence it had amassed against Prousalis.

Moreover, Prousalis's blanket denial of guilt in this petition is flatly contradicted by his detailed admission of guilt under oath. In his lengthy statement at the time of sentence he reconfirmed his guilt.[3]

---

[3] Prousalis explains that he gave a false and misleading statement at the sentencing proceeding despite the fact that he "never wavered from his strong belief" that he did not commit a criminal offense.

30

Finally, Prousalis attacks his plea on the ground that he "never received nor reviewed" a copy of the superseding indictment to which his plea was entered, and therefore did not "realize nor understand at the time of his plea that a superseding indictment had been issued against him by a grand jury, in effect replacing the original indictment." This claim can be swiftly rejected. In the arraignment on the superseding indictment, great care was taken to identify the instrument correctly to Prousalis and the extensive colloquy with counsel concerning the addition of count three to the indictment drove the point home. At the plea, each count was separately described to Prousalis. No confusion was possible, and his assertion of confusion in his petition is insufficient to attack the validity of the plea.

3. Sentence

Although Prousalis repeatedly asserts that he is not attacking his sentence, he nonetheless argues that counsel provided ineffective assistance in connection with his sentence as well. He complains that they did not accompany him to the meeting with the probation officer who was preparing the presentence report.[4] He falsely asserts that he never received a

---

[4] Prousalis asserts that he did not understand that the presentence report would be made available to the public. He

31

copy of the September 17, 2004 report.  Prousalis incorrectly

asserts that defense counsel never filed a sentencing

memorandum.  He further asserts that Entin did not confer with

him adequately before the sentence, was unprepared for it, and

lied when he assured the Court that he and Prousalis had

reviewed the September 17 report and had discussed it with each

other.

These accusations do not undermine the validity of the

conviction because they do not suggest that his plea was

anything other than knowing and intelligent.  Moreover, to the

extent that these complaints concern the presentence report,

Prousalis does not suggest that the report contained any error

that more careful review could have uncovered.  As for his

contention that he did not read the presentence report or review

it with counsel before the sentencing proceeding, Prousalis sat

silent as his counsel assured the Court that he had done so.

Prousalis spoke at length during the sentencing proceeding and

had ample opportunity to correct the record.


4.   Appeal

The petition's complaints about the adequacy of

representation on the direct appeal from the conviction do not

---

does not explain how he came to believe that the report is
publicly disclosed.  It is not.

affect the validity of Prousalis's conviction. In any event, they are without merit.

Prousalis complains that his attorneys did not confer with him sufficiently regarding the issues raised on appeal. He asserts that he did not understand until he read the brief that he may have waived his right to appeal his sentence through acceptance of the plea agreement. Prousalis, however, has failed to identify any prejudice that he suffered from the lack of consultation. Based on the allocution at the time of his plea, the assertion by Prousalis that he only recently realized that he had waived his right to appeal his sentence is rejected.

Finally, Prousalis asserts that after the Second Circuit summarily dismissed his appeal he asked his attorneys to request a rehearing en banc and to file a petition for a writ of certiorari, but they did not make either filing. Because a defendant has no right to counsel for these discretionary appeals, see Ross v. Moffitt, 417 U.S. 600, 610-11 (1974), a petition for a writ of habeas corpus cannot be premised on this claim of ineffective assistance of counsel. Hernandez v. Greiner, 414 F.3d 266, 269 (2d Cir. 2005); Chalk v. Kuhlmann, 311 F.3d 525, 528 (2d Cir. 2002). Since a defendant has "no constitutional right to counsel [to pursue a discretionary appeal], he could not be deprived of the effective assistance of counsel by his retained counsel's failure to file the

33

application [for such an appeal] timely." Wainwright v. Torna,
455 U.S. 586, 587-588 (1982).

C.  Violation of Fifth Amendment Rights[5]

Prousalis contends that the Government violated his Fifth
Amendment rights by not advising him prior to his deposition in
2002 that he was under investigation.  Prousalis asserts that he
would have asserted his right against self-incrimination rather
than testify if he had known of the investigation.[6]

The deposition was taken in connection with civil
litigation commenced by Bernard Carl, a close friend of
Prousalis and an investor in the Busybox IPO.  Carl sued
officers and directors of Busybox to recover his losses from the
investment, but did not sue Prousalis.  The defendants in the
civil litigation were represented by the law firm Patton Boggs,
who Prousalis asserts provided the Government with the documents
produced and the depositions taken in the civil litigation.
Carl alerted Prousalis in April 2003 that Prousalis might be a
target in a criminal investigation.  Prousalis promptly called

---

[5] The petition also asserted that Prousalis's rights under the
Speedy Trial Act were violated because his trial began less than
thirty days after his arraignment on the superceding indictment.
Prousalis has withdrawn that contention based on the
Government's response that the entry of the plea waived the
defendant's right to pursue such a claim.

[6] Prousalis explains that he "splayed himself in 15 hours of
videotaped depositions."

34

the AUSA in the Southern District of New York conducting the investigation and spoke at length by telephone to the AUSA and an FBI agent.  In October, while represented by White & Case, Prousalis met on three occasions with the AUSA, an SEC attorney and others.  According to Prousalis, "believing that an indictment could be avoided by cooperating with the government, the defendant kowtowed and pandered to the government's rendition of the facts and law of the case, however false and misleading."  Following his indictment, the Government produced in discovery the materials it had received from the civil litigation, and Prousalis and his attorney discussed what Prousalis believed was the Government's "unfair and secret conduct" in getting that information.  At that time, however, Prousalis and his counsel did not move to suppress these documents because, according to Prousalis, he and his counsel "did not realize the important constitutional issues involved."

Prousalis concedes in his reply memorandum that by failing to move to suppress the documents and testimony obtained from Patton Boggs he has waived his right to raise this Fifth Amendment claim here.  He reconfigures the claim, however, as another example of his counsel's failure to represent him effectively at trial.  Even assuming that this Sixth Amendment claim is not barred under Tollett as an independent

constitutional claim unrelated to the validity of his plea, it plainly fails.

The cases cited by Prousalis in support of this claim draw on the Supreme Court's consideration in United States v. Kordel, 397 U.S. 1 (1970), of whether certain government conduct can "reflect such unfairness and want of consideration for justice as independently [of any violation of the Fifth Amendment] to require the reversal of [criminal] convictions." Id. at 11. The Kordel Court identified several examples of conduct that might suggest impropriety, including "where the Government has brought a civil action solely to obtain evidence for its criminal prosecution, or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution." Id. at 11-12. This principle has been applied to at least two prosecutions where the U.S. Attorney's Office actively collaborated with S.E.C. investigators regarding the conduct of discovery and hid its involvement to keep the defendant unaware of the parallel criminal investigation. See United States v. Stringer, 408 F. Supp. 2d 1083 (D. Ore. 2006); United States v. Scrushy, 366 F. Supp. 2d 1134 (N.D. Ala. 2005).

Although the Busybox civil litigation was not initiated by the government and included no government entity as a party, Prousalis claims that the Government "conducted a comprehensive, parallel, secret criminal investigation . . with a willing,

36

conspiring confederate," namely, Patton Boggs.  There is no

basis to apply Kordel's suggestion to this prosecution.

Prousalis has not shown that the Government was a party to or

contributed in any way to the litigation strategy employed in

the Busybox civil litigation.  The party that apparently

provided documents from that litigation to the Government was

not even the plaintiff.  "To establish a Fifth Amendment

violation, a plaintiff must demonstrate that in denying the

plaintiff's constitutional rights, the defendant's conduct

constituted state action."  D.L. Cromwell Investments, Inc. v.

NASD Regulation, 279 F.3d 155, 161 (2d Cir. 2002) (citation

omitted).  Since Prousalis has not shown that his Fifth

Amendment rights were implicated by any Government misconduct,

he could not have been prejudiced by his counsel's failure to

file a fruitless motion to dismiss the indictment on this

theory.

D. Sixth Amendment Violation

    In a supplemental but timely amendment to his petition,

Prousalis argues that his bail bond company violated his Sixth

Amendment right to counsel of his choice by requiring him to

retain Kenner.  Prousalis asserts that his conviction must be

vacated and the indictment dismissed because the bail bond

company was acting as an agent of the Government when it

37

deprived him of counsel of his choice, and that Kenner operated under a conflict in representing him since Kenner's pecuniary interests conflicted with his client's Sixth Amendment rights.

Prousalis reports that bail was set in the amount of $2 million. Prousalis located Josh Herman Bail Bonds ("Herman") in Beverly Hills, California, which agreed to post bond for him on the condition that, inter alia, the defendant retain Kenner, a criminal defense attorney from Encino, California. Kenner in turn required Prousalis to retain Entin as well. Entin resided in Ft. Lauderdale, Florida. While Prousalis, who lived in the Washington, D.C. area, preferred to retain Washington or New York counsel, he agreed to retain Kenner and Entin for $250,000.[7]

Because this claim fails under the facts as alleged by Prousalis, it is unnecessary to hold a hearing to determine whether this allegation is true. The actions of a private entity may be deemed state action only if "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." Disabled in Action of Metropolitan New York v. Hammons, 202 F.3d 110, 122 (2d Cir. 2000) (quoting Blum v. Yaretsky, 457 U.S. 991, 1004

---

[7] Prousalis also asserts, falsely, that he was unaware of Kenner's criminal record. Prousalis waived all right to complain about Kenner's conviction in the Curcio proceeding held to address that very fact.

38

(1982)); see also D.L. Cromwell Investments, 279 F.3d at 161.

"Whether such a 'close nexus' exists . . . depends on whether

the State 'has exercised coercive power or has provided such

significant encouragement, either overt or covert, that the

choice must in law be deemed to be that of the State.'" American

Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 52 (1999) (quoting

Jackson v. Metropolitan Edison Co., 419 U.S. 345, 350 (1974)).

While bail bondsmen have been held to be state actors in

certain discrete factual contexts, such as when making arrests

with the assistance of law enforcement officers, see Landry v.

A-Able Bonding, Inc., 75 F.3d 200, 204 (5th Cir. 1996)

(collecting cases), Prousalis has cited no authority and alleged

no facts sufficient to show that Herman's decision to condition

the issuance of the bond on Prousalis's retention of a

particular attorney was in any way "encouraged," either overtly

or covertly, by the Government such that this action could

fairly be attributed to the Government.

Prousalis has not asserted that the Government was even

aware of this alleged demand.  Even if he could show Government

awareness, however, that would not be sufficient to attribute

the acts of the bail bond company to the Government.  "Action

taken by private entities with the mere approval or acquiescence

of the State is not state action."  Hammons, 202 F.3d at 123

(quoting Sullivan, 526 U.S. at 52).  In addition, although

39

Prousalis states that he "had difficulty locating a bond company," it should also be noted that he was under no obligation to contract with Herman, and could have continued his search for another bondsman if he considered Kenner or Entin to be unacceptable attorneys.  Prousalis, however, following "several" telephone calls with Kenner, consented to this arrangement.  Thus, his contention that he was presented with a "Faustain choice" is contradicted by his own factual account.

In the conclusion of his Supplemental Memorandum, Prousalis additionally argues that because Kenner "had constructive notice" that Prousalis had been deprived of his choice of counsel in violation of the Sixth Amendment, Kenner had a conflict of interest whereby his "pecuniary interests [were] in conflict with [his] cleint's constitutional rights."  This claim is also without merit.

A criminal defendant's Sixth Amendment right to counsel includes a "'correlative right to representation that is free from conflicts of interest.'"  United States v. Williams, 372 F.3d 96, 102 (2d Cir. 2004) (quoting Wood v. Georgia, 450 U.S. 261, 271 (1981)).  There are three general categories of attorney conflict that implicate this right.  First, certain "conflicts . . . are so severe that they are deemed per se violations of the Sixth Amendment," such as where "trial counsel is not authorized to practice law and where trial counsel is

40

implicated" in the defendant's criminal enterprise. Id. at 102-
03. Second, an "actual conflict of interest occurs when the
interests of a defendant and his attorney diverge with respect
to a material factual or legal issue or to a course of action."
Id. at 102 (citation omitted). Such conflicts violate the Sixth
Amendment if they "adversely affect the attorney's performance."
Id.; see also id. at 106. Finally, a "potential conflict of
interest [occurs] if the interests of the defendant . . place
the attorney under inconsistent duties at some time in the
future," and such conflicts violate the Sixth Amendment if they
"result in prejudice to the defendant." Id. 102-03 (citation
omitted).

Even assuming that the arrangement between Herman and
Kenner gave rise to an actual or potential conflict, see Amiel
v. United States, 209 F.3d 195, 198-99 (2d Cir. 2000)
(discussing contexts in which such conflicts might arise),
Prousalis has not identified any prejudice to his defense as a
result of this conflict, nor has he identified any "plausible
alternative defense strategy" that was not pursued by Kenner or
Entin, much less one that was not undertaken specifically "due
to" the alleged conflict. Thus, this claim also fails.

## Conclusion

Prousalis's petition is denied.  No certificate of appealability shall issue.  Petitioner has not made a substantial showing of a denial of a federal right, and appellate review is therefore not warranted.  Love v. McCray, 413 F.3d 192, 195 (2d Cir. 2005).  Moreover, any appeal from this order would not be taken in good faith.  See 28 U.S.C. § 1915(a)(3); Coppedge v. United States, 369 U.S. 438, 445 (1962).  The Clerk of Court shall dismiss the petition.

SO ORDERED:

Dated:    New York, New York
          August 23, 2007

DENISE COTE
United States District Judge

COPIES SENT TO

Seetha Ramachandran
Assistant United States Attorney
One Saint Andrew's Plaza
New York, NY 10007

Thomas T. Prousalis, Jr.
47351-083
La Tuna FCI
P.O. .Box 6000
Anthony, TX 88021